1

2

3 **FILED**

4 DEC 05 2014

5

6 RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

7

8 NOT FOR CITATION

9 IN THE UNITED STATES DISTRICT COURT

10 FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12 JONATHAN CARDENAS, ) No. C 13-4199 LHK (PR)
   )
13 Petitioner, ) ORDER DENYING PETITION FOR
   ) WRIT OF HABEAS CORPUS;
14 vs. ) DENYING CERTIFICATE OF
   ) APPEALABILITY
15 GARY SWARTHOUT, )
   )
16 Respondent. )
   )

17

18 Petitioner, a state prisoner proceeding *pro se*, filed a petition for writ of habeas corpus

19 pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the petition

20 should not be granted. Respondent has filed an answer. Although given an opportunity,

21 petitioner has not filed a traverse. Having reviewed the briefs and the underlying record, the

22 court concludes that petitioner is not entitled to relief based on the claims presented, and

23 DENIES the petition.

24 **PROCEDURAL HISTORY**

25 In 2008, a jury found petitioner guilty of second degree murder. The jury also found true

26 the allegation that petitioner personally used a knife. Petitioner was sentenced to a term of 16

27 years to life in state prison. On March 15, 2012, the California Court of Appeal affirmed

28

1  petitioner's convictions and judgment. On June 13, 2012, the California Supreme Court denied

2  petitioner's petition for review.

3       On September 10, 2013, petitioner filed the underlying federal petition for writ of habeas

4  corpus.

5                                   **BACKGROUND**[1]

6       **A. Prosecution Case**

7       On October 6, 2008, Cardenas was at home drinking beer with his friends
        Paris Lenc and Ryan Lanthier. Cardenas had a shiny pocket knife on his
8       dresser. The three went to Lenc's home and smoked some marijuana. Lenc
        grabbed two steak knives, keeping one and handing the other to Lanthier. At
9       some point, Lenc got a call from a minor female, N.C., asking him to come
        hang out with her.

10
        N.C. and her friend Samantha I. (also a minor) had rented a motel room at the
11      Paradise Inn near the Santa Cruz Beach Boardwalk. Cardenas, Lenc and
        Lanthier met Samantha and N.C. at a bowling alley near the Paradise Inn.
12      Neither N.C. nor Samantha had ever met Cardenas or Lanthier before, but
        Samantha was immediately attracted to Cardenas. The group went back to the
13      motel room, where they drank some beer and Samantha flirted with Cardenas.

14      After 15 to 30 minutes, Samantha and N.C. went to a nearby liquor store to
        buy more beer. On the way to the store, they ran into Robbie Reynolds and
15      his two friends, Joseph Paul and Jose Reyes. The group continued to the
        store, where Samantha bought six large cans of beer, using a fake I.D., and
16      Paul bought a cigar, which they would use to smoke marijuana. Samantha
        and N.C. invited Reynolds, Paul and Reyes back to the motel room to play
17      games and drink beer. Paul got the impression that they would "smoke and
        drink and just chill."

18
        When they got back to the room, Samantha and N.C. entered first, followed
19      by Reynolds and the other two men. When they saw Cardenas, Lenc and
        Lanthier in the room, the three newcomers became quiet. Neither Samantha
20      nor N.C. had mentioned that there were other men in the room already. Paul
        recognized Cardenas, though he did not know his name, and he noticed that
21      Cardenas, Lenc and Lanthier were all wearing black.

22      Paul sat in a chair, while Reynolds sat on one end of the bed and Reyes sat
        down on the other end. Reynolds took out some marijuana, which he gave to
23      Paul to roll into the cigar. Samantha placed her purse on the bed, opened a
        beer and passed out the other beers.

24
        After a couple of minutes, Paul said one of the other three men asked, "where
25      you from, where you guys from?" which he understood was a gang-related
        question. Lanthier volunteered he was from "West Side Santa Cruz," and
26      Reynolds may have said he used to live in West Side Santa Cruz, but now was

27
        ───────────────
28      [1] The following facts are taken from the California Court of Appeal's opinion.

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.13\Cardenas199hcden.wpd

2

1   "downtown, and we don't gangbang or anything." Lenc was quiet, but
    Cardenas and Lanthier asked if the other men were "down with gangbanging."
2   Paul, Reynolds and Reyes said they were not, but "just like to chill and smoke
    and have a good time."
3
    Cardenas, who was wearing an Atlanta Braves cap, introduced himself as
4   "Cartoon," and said he was from West Side Santa Cruz but had moved from
    Salinas to Santa Cruz. He also said he was a Northerner, which Paul
5   understood to mean "Norteno."

6   Paul asked Cardenas if he remembered him, and Cardenas said he did.
    Cardenas had recently beaten up one of Paul's friends. Cardenas asked "are
7   you with him [i.e., the friend who got beaten up]?" but Paul said he was not.
    Smiling, Cardenas said he "beat him up pretty good." After that exchange,
8   Paul stopped talking to Cardenas, Lenc and Lanthier.

9   Cardenas and Samantha were continuing to flirt and went into an adjoining
    bedroom for 15 to 45 minutes. They talked and had sex. Everyone else
10  remained in the main room, and Reynolds turned the volume up on the
    television to try to cover the sounds of the two having sex in the back.
11  Reynolds talked about Samantha being promiscuous and asked N.C. why she
    did not warn Cardenas that Samantha was "nasty." Everyone joked and
12  laughed about how Samantha had just met Cardenas and was having sex with
    him. Reynolds took a marker and wrote "FTW" [FN2] on the wall, then
13  started going through Samantha's purse on the bed.

14          FN2. "Fuck the world."

15  After Samantha and Cardenas returned to the room, someone suggested they
    needed more alcohol, and Samantha said she had money. She looked in her
16  purse and discovered she was missing $60. Samantha asked everyone but
    Cardenas and N.C. where her money was. Reynolds was laughing and said,
17  "why would I take your money, I got money." Samantha started getting more
    aggressive and louder, demanding that Reynolds, Paul and Reyes turn out
18  their pockets. Reynolds would not do so, and said, "bitch, no one wants your
    money." Samantha told Reynolds, Paul and Reyes to leave, and then she and
19  Reynolds continued to yell and swear at each other at the doorway for a few
    minutes. Samantha kept saying "fuck you, Robbie" and "that's fucked up,
20  Robbie." Reynolds got angry and said, "bitch, shut up."

21  Reynolds started walking towards the motel office, and Paul said, "Come on,"
    "if you've got it [i.e., Samantha's money], come back and give it to her." As
22  Samantha continued to curse at Reynolds he walked back to the door of the
    room and, laughing, threatened to slap her. Cardenas was standing behind
23  Samantha, to one side.

24  Reynolds slapped or hit Samantha on the cheek. [FN3.] Almost immediately,
    Cardenas punched Reynolds in the jaw. Reynolds' knees buckled, and he fell
25  back against the door, but then got up swinging, as if trying to push Cardenas
    away. Cardenas stepped back and Reynolds' swing missed. The two then
26  began swinging at each other. Paul and Reyes came back into the room and
    Reyes saw Lanthier and Lenc moving towards Reynolds. Reyes pushed
27  Lanthier, who fell on the bed. Lanthier got up, pulled out a knife and
    threatened Reyes, telling him to get out.
28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.13\Cardenas199hcden.wpd

3

1    FN3. Samantha testified Reynolds punched her with his hand closed.
     Paul testified it was an open-handed slap. Reyes recalled it being
2    more of a "push."

3

4    Paul told Lenc to back away from Cardenas and Reynolds so it would be a fair
     fight. He looked over and saw that Lanthier had pulled out a knife. As he
     turned back to Lenc, Lenc pulled out a short switchblade knife, so Paul
5    grabbed him and swept his leg out from underneath him, knocking him to the
     floor. Paul saw Cardenas lying on the bed with Reynolds leaning over him,
6    trying to hit him in the chest. Reynolds' torso was within a few inches of
     Cardenas' torso. Cardenas' hand was on Reynolds' shoulder, pulling him
7    down toward himself. Paul saw Reynolds land three punches on Cardenas,
     whereas five or six of Cardenas' punches connected. The fight lasted about a
8    minute or two.

9    About 20 seconds after Reynolds and Cardenas were fighting on the bed, they
     separated, and Reynolds walked out of the motel room, with Paul and Reyes
10   behind him. Lanthier flashed his knife and told Reyes, "get out," "we don't
     want to stab nobody, get out." Paul did not see Cardenas holding a knife and
11   did not know Reynolds had been stabbed. Cardenas walked backward toward
     the door, saying "I'm cool" twice.

12
     Reynolds walked away from the room, touched his ribs and then fell face first
13   in the parking lot, apparently unconscious. Paul tried to pick him up, and
     realized Reynolds had been stabbed. He saw blood on Reynolds' chest and
14   told Reyes to call 911.

15   Reyes saw Reynolds appeared to be struggling for breath, and he tried to
     cover the wound while he talked to him. Reyes called 911. He later claimed
16   he did not recall seeing Cardenas with a knife, but admitted he did not want to
     talk about the incident.

17
     Paul was angry and wanted to fight Cardenas, but Cardenas had run away up
18   the street. Paul sprinted after him, but lost him. When he heard sirens, he ran
     down the hill and saw Reyes holding Reynolds. Because he believed there
19   was a bench warrant for his arrest for failing to appear in court, Paul ran off
     down the street. Paul encountered Lenc, who held up his hands to indicate he
20   did not want to fight. Lenc said, "I didn't know he was going to stab your
     homie." In his interview with police, Paul said Lenc had said, "you seen him,
21   he just stabbed your homie." Paul walked around downtown for a couple of
     hours, then fell asleep at a park across from Reynolds' house.

22
                      **1. Samantha's trial testimony**
23
     Samantha testified that after Reynolds left the motel room and she was about
24   to close the door, he said, "well, I should hit a bitch." She responded, "well,
     hit a bitch then." As she stood in the doorway, Reynolds punched the left side
25   of her face. Samantha grabbed her nose, and next saw Cardenas and Reynolds
     fighting. She did not know who started the fight. At one point she saw
26   Reynolds leaning over Cardenas who was lying on the bed with his feet on the
     floor. Samantha said she saw Reynolds punch Cardenas once, but also said
27   she did not see Reynolds punch him. She did not see Cardenas punch
     Reynolds, but saw him grab Reynolds to push him off. She had a vague
28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.13\Cardenas199hcden.wpd

4

1   memory of seeing Cardenas holding Reynolds.

2   At some point she saw Cardenas standing on a round table next to the bed and
    admitted telling police Cardenas was standing on a table. Cardenas screamed,
3   but Samantha could not remember what he said. She was not absolutely
    certain, but thought he may have yelled, "I'm going to stop this fool," or "I'm
4   going to stab this fool."

5   After Reynolds fell down, Samantha saw "everybody running out the door."
    When she heard the sirens, she ran away to avoid contact with the police
6   because she herself was a runaway. She went to a nearby motel and called her
    mother.

7
    Samantha testified she did not see anyone with a knife, and denied
8   remembering that she told the police she saw Cardenas with a knife or that he
    held a knife in his right hand and pulled it out of Reynolds' side. She
9   admitted liking and having strong feelings for Cardenas, and also admitted
    lying to police about his name.

10
    Samantha admitted having a tattoo of four dots on her hand, which she said
11  meant she is a "North Sider," and "back[s] up Nortes to the fullest." She
    testified that she got this tattoo after the murder, and it indicated "you're in a
12  gang, that you have been jumped in."

13              **2. Samantha's police interviews**

14  In her interview with police, however, Samantha said that Cardenas stabbed
    Reynolds. When Santa Cruz Police Detective Gregory Crofts interviewed
15  Samantha on October 7, it appeared that she was holding back information.
    After she learned that Reynolds had died, she returned to the police
16  department upset and volunteered more information. She identified Cardenas
    by name, said he was from Salinas, and he had stabbed Reynolds at the motel.

17
    Samantha told police that Cardenas came forward after Reynolds hit her and
18  began fighting with Reynolds. She and N.C. tried to break up the fight.
    Cardenas, Lenc and Lanthier all had knives. She mentioned that Cardenas
19  was standing on a table, and she saw him pull out the knife, with the blade
    protruding between his thumb and index finger. Cardenas was holding the
20  knife in his right hand and stabbed Reynolds on the left while he was partially
    turned away from Cardenas. However, she also sometimes said that Reynolds
21  fell on the knife. After everyone left the room, Cardenas came back to
    retrieve his hat.

22
    In her interview with Santa Cruz Police Detective Michael Hedley, Samantha
23  similarly described Reynolds as partially turned away from Cardenas when he
    was stabbed. Samantha said she "saw [Cardenas] pulling the knife back, and
24  it was kind of like a surprise moment" for her. It was her impression that
    Cardenas pulled the knife because he was angry. She could not recall if he
25  jumped on the table before or after he stabbed Reynolds, but she "did see him
    jump on the table." Cardenas was screaming something, and she was unsure
26  what it was, but he "might have said something about the knife."

27  Prior to trial, District Attorney Inspector Raul Castellanos photographed
    Samantha's tattoos, which consisted of the four dots on her hand, as well as
28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.13\Cardenas199hcden.wpd

5

the words "Santa Cruz" on her leg. Samantha told Castellanos that she got the four dots tattoo before the murder, and the "Santa Cruz" tattoo afterwards.

### 3. N.C.' s trial version of the fight

N.C. saw Cardenas and Reynolds hitting each other, saying Reynolds was "going crazy" and "kicking ass." She did not see anyone with a knife. N.C. said she stepped between Cardenas and Reynolds, put her arms around Reynolds and told him to stop. She heard Samantha also telling Reynolds to stop, but could not remember what Samantha was doing otherwise or where anyone else was at the time.

N.C. heard Cardenas yell, while standing on the bed, "I'm going to stab him." She did not think this was serious, so she walked into the bathroom. The next thing she knew, Samantha knocked on the bathroom door and told her to "get out." Samantha appeared scared and everyone had already left the room.

N.C. did not see anyone stabbed and did not see anyone with a knife. She did not recall telling the police that Cardenas had a purple knife. Outside, N.C. saw Cardenas, Lenc and Lanthier running toward the bowling alley and she saw Reynolds on the ground in the parking lot. Samantha was scared and sad. She heard Reyes telling Reynolds to breathe. She called 911, and Reyes told her, "don't tell the cops what happened." Samantha ran away, but she and Reyes stayed with Reynolds.

### 4. N.C.'s police interview

N.C. and Samantha met up with Cardenas, Lenc and Lanthier by the bowling alley before they went back to the motel room. She and Samantha went downtown to buy more alcohol and ran into Reynolds, Reyes and Paul. They invited them back to the motel room as well.

Reynolds asked Cardenas and his friends if they were West Siders, and they said they were. It seemed as if everyone was getting along. Samantha and Cardenas went into the back room and had sex, and everyone else made fun of them. Reynolds was "talking some shit" about Samantha. When Samantha came back to the main room, she looked in her purse and said her money was missing. She accused Reynolds of taking it and began arguing with him. Reynolds told her to shut up or he would slap her. Samantha said, "just hit me," and he did. Samantha started to cry and everyone started fighting.

N.C. thought Reynolds was "kicking [Cardenas's] ass," and thought Reynolds punched Cardenas quite a few times. Reynolds, Reyes and Paul did not have weapons, but Cardenas had a knife. She saw him stand on a table, holding his purple knife, and saying, "I'm going to stab him." N.C. did not see Reynolds get stabbed and assumed it happened outside, since that is where he fell.

### 5. Police response

Alexander Ganzel, a City of Santa Cruz police officer, received a dispatch to respond to the Paradise Inn on Second Street at 11:40 p.m. on October 6, 2008. He was the first officer to arrive on the scene and upon parking in the motel lot, he saw three people. Reynolds was lying on his back. Reyes knelt beside him, pressing on his chest, while N.C. stood nearby, crying. Ganzel

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.13\Cardenas199hcden.wpd

6

1  ran up to them and asked them who had done this. Reynolds was
unresponsive, his eyes were droopy and he was gasping for air. Ganzel

2  looked for injuries and found what appeared to be a knife wound on the left
side of Reynolds' chest and a second wound on his chin. Reyes and N.C. both

3  claimed that they had just found Reynolds lying in the parking lot.

4  Santa Cruz Police Officer William Clayton arrived about the same time as
Ganzel. He saw Reynolds struggling to breathe and losing consciousness.

5  When Clayton asked Reynolds what happened, Reyes interrupted and told
Reynolds in a defensive and hostile tone, "[d]on't say anything to him."

6
Santa Cruz Police Officer Sergio Venegas contacted Lenc, who was near the

7  Paradise Inn. Lenc said he had been at home with his mother. When Venegas
searched Lenc's room at his house, he collected a knife from the front pocket

8  of a pair of jeans on the floor.

9  Santa Cruz Police Detective Dave Forbus interviewed Reyes some hours after
the murder. Reyes appeared tired, anxious and in shock. He admitted he was

10  scared. Reyes said Cardenas punched Reynolds first, then Lenc hit Reynolds
in the face. Reyes saw Cardenas with a knife, and Lanthier brandished a knife

11  at him after Reynolds walked out of the hotel room. Reyes said the fight
lasted only 15 seconds. Forbus described Reyes as hesitant and confused; he

12  was fearful of being labeled a snitch.

13  When Santa Cruz Police Detective David Pawlak interviewed Reyes again on
October 7, Reyes was not forthcoming. At first, Reyes claimed the incident

14  had nothing to do with gangs, he did not see any knife and did not see anyone
swing at Reynolds. Later, he said there was some pushing. He also said he

15  heard, "West Side," but claimed he paid no attention to that. Reyes did not
want to give the police any information and was, in part, afraid of being a

16  snitch. Later, he said all three of the other men – Cardenas, Lenc and Lanthier
– had knives.

17
District Attorney Inspector Lewis [FN4] Schlumbrecht drove Reyes home

18  from the courthouse during the trial. Schlumbrecht said that Reyes was
nervous and constantly looking around to see if they were being followed.

19
FN4. Called to the stand as Kent, but when sworn in, corrected the

20  court that his first name was Lewis.

21  On October 9, Forbus interviewed Paul, who said Cardenas introduced
himself as "Cartoon" and asked, "are you guys down with gangbanging." He

22  said Cardenas said he was a Northerner and his friends said they were West
Side, but it was not said aggressively. Reynolds called Samantha a bitch

23  before slapping her; Paul described it as a "little slap." Paul said Cardenas
punched Reynolds "out of nowhere." Reynolds fought with Cardenas, trying

24  to put him down, but no one was really winning the fight. The two ended up
on the bed because "we were all pushing at them" and there was very little

25  room between the bed and the door.

26  Paul did not see a knife in Cardenas' hand, did not see him stand on a table
and did not hear him threaten to stab anyone. While he was fighting with

27  Lenc, he saw Reynolds walk out. Detective Forbus, who interviewed Paul,
described his demeanor as direct, confident and sad.

28

Lanthier thought Cardenas and Lenc were West Siders, and he admitted
telling police they were West Side Nortenos. His nickname was "Ryder," and
Lenc's was "Bloody." Lanthier initially did not say much to the police,
hoping the situation would "just go away." He admitted in his interview he
was trying to protect Lenc.

### 6. Autopsy

Dr. Richard Mason determined Reynolds' cause of death to be a stab wound
to the right ventricle of the heart, resulting in hemothorax and
hemopericardium, meaning a collection of blood in the chest and sac around
the heart. The knife wound was one inch long and two inches deep, and was
inflicted by a single-edged blade with the cutting edge facing the midline of
Reynolds' torso. It penetrated between the sixth and seventh rib,
perpendicular to his body, and was an "in and out" wound, meaning Reynolds
was stationary when the wound was inflicted. It was possible the stabber
grabbed Reynolds and pulled him toward the knife.

Immediately after the stabbing, blood began to accumulate in the pleural
space around Reynolds' left lung, making him feel like he could not breathe.
His blood pressure would have dropped suddenly, causing confusion and
panic within about 30 seconds of the stabbing.

Reynolds also had a bruise on his left eye, a bruise on his left elbow, and
small bruises on the knuckles of his left pinky and middle fingers. He had an
abrasion on his chin consistent with landing on a rough surface, such as
asphalt.

Reynolds' blood alcohol level was 0.129 percent and also tested positive for
marijuana, meaning he had ingested marijuana anywhere from 30 minutes to
one week prior to death. He had $22 in cash and 4.7 grams of marijuana in
his pocket.

A purple knife was recovered from an apartment patio not far from the motel,
and DNA on the knife matched Reynolds' DNA.

### 7. Gang evidence

Santa Cruz Police Detective Jose Garcia, a gang expert, was the lead detective
in the case. Garcia testified that Nortenos, or Northerners, associate with the
color red, as well as the numbers 14 and 4. Cardenas was a member of a
Salinas Norteno street gang, Acosta Plaza, at the time of the murder. The
Atlanta Braves baseball cap he wore the night of the murder was associated
with Acosta Plaza.

Lenc was also a member of a Norteno street gang and had "Northside"
tattooed above his eyebrows, as well as an "S" and a "C," representing "Santa
Cruz," on his cheeks.

Garcia also testified that Santa Cruz is predominantly a Sureno city, and the
Beach Flats area was Sureno territory.

According to Garcia, the concept of respect is very important within a gang.

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.13\Cardenas199hcden.wpd

8

1   Respect may be earned by committing violent crimes or by being a good
    leader.  Respect is lost if a gang member acts cowardly, loses a fight, or fails
2   to respond to a challenge, which may consist of a slight, an insult, a
    challenging look, claiming membership in a rival gang or flashing a rival gang
3   sign/tattoo.  When someone claims a gang, it is meant as an assertion of
    dominance and a challenge to rival gang members.  If someone asks "Where
4   you from," the question can actually mean, "What gang are you in?"  Any
    disrespect directed towards anyone closely associated with a gang member,
5   such as family, girlfriends and close friends, is considered disrespect towards
    the gang member.  If someone "punks out" in front of a fellow gang member,
6   it is a problem.  Gang members frequently carry weapons, including knives.

7   In gang culture, being a "snitch" can lead to serious, negative consequences,
    up to and including being killed.  A gang expects its members not to talk to
8   the police or anyone outside the gang about fellow gang members and the
    gang's activities.

9
    *People v. Cardenas*, No. H035900, 2012 WL 882887, *1 - *8 (Cal. App. March 15, 2012).
10
                                    **DISCUSSION**
11
    A.      Standard of Review
12
            This court may entertain a petition for writ of habeas corpus "in behalf of a person in
13
    custody pursuant to the judgment of a State court only on the ground that he is in custody in
14
    violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The
15
    petition may not be granted with respect to any claim that was adjudicated on the merits in state
16
    court unless the state court's adjudication of the claim: "(1) resulted in a decision that was
17
    contrary to, or involved an unreasonable application of, clearly established Federal law, as
18
    determined by the Supreme Court of the United States; or (2) resulted in a decision that was
19
    based on an unreasonable determination of the facts in light of the evidence presented in the
20
    State court proceeding."  28 U.S.C. § 2254(d).
21
            "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state
22
    court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of
23
    law or if the state court decides a case differently than [the] Court has on a set of materially
24
    indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  "Under the
25
    'reasonable application clause,' a federal habeas court may grant the writ if the state court
26
    identifies the correct governing legal principle from [the] Court's decisions but unreasonably
27
    applies that principle to the facts of the prisoner's case."  *Id.* at 413.
28
    Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
    P:\PRO-SE\LHK\HC.13\Cardenas199hcden.wpd
                                        9

1       "[A] federal habeas court may not issue the writ simply because the court concludes in its

2   independent judgment that the relevant state-court decision applied clearly established federal

3   law erroneously or incorrectly. Rather, the application must also be unreasonable." *Id.* at 411.

4   A federal habeas court making the "unreasonable application" inquiry should ask whether the

5   state court's application of clearly established federal law was "objectively unreasonable." *Id.* at

6   409.

7   B.    Analysis

8       In the petition, petitioner claims that:  (1) the trial court improperly admitted evidence

9   regarding gangs and petitioner's prior statements about gang culture even though there was no

10  evidence that petitioner's offense was gang-related; (2) the trial court erred in refusing

11  petitioner's request to modify CALCRIM Nos. 371 and 372 to instruct the jury that

12  "consciousness of guilt may not be considered in determining the degree of defendant's guilt";

13  and (3) the cumulative errors prejudiced him.

14      1.    Admission of gang-related evidence

15      Petitioner argues that the trial court should not have allowed the prosecution to introduce

16  gang evidence or petitioner's prior statements about gang culture because there was no gang

17  enhancement charged, and no allegation that the killing was gang-related.[2]

18      At trial, the prosecution moved to introduce gang evidence as well as to allow a gang

19  expert to testify about the Norteno gang and gang culture. *Cardenas*, 2012 WL 882887, at *8.

20  The expert would specifically testify about the "concepts of respect and disrespect in gang

21  culture, the significance of claiming gang membership, the nature of gang assaults, what it means

22

23      

24      [2] Respondent argues that this claim is unexhausted. A federal court may deny an unexhausted claim or petition on the merits when it is clear that the applicant does not raise a colorable federal claim. *See Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005). Here, because the court has determined that petitioner's claim is not a colorable federal claim, the court need not reach the issue of exhaustion. Rather, the court exercises its discretion and denies the claim on the merits. *See* 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

25  

26  

27  

28  

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.13\Cardenas199hcden.wpd

1   when a gang member arms him/herself and the importance of supporting another gang member."
2   *Id.* In addition, the prosecution sought to introduce that a few months before the stabbing,
3   petitioner told a police officer that if someone had said something disrespectful about
4   petitioner's mother, he "would not just stand by and do nothing." *Id.* at *12. Also, petitioner
5   said it would be dangerous for someone to yell "Norte" or "West Side," or shout gang slogans
6   because it would probably lead to fights and shootings. *Id.*

7          The California Court of Appeal rejected petitioner's claim based on state law. It found
8   that the gang evidence was relevant to petitioner's motive. "[T]he theory of the prosecution was
9   that Cardenas felt disrespected when Reynolds hit Samantha, a girl with whom he had recently
10  had sex. Cardenas could not allow that challenge to his dominance go unanswered, particularly
11  since at least one fellow gang member, Lenc, was present. Consequently, he attacked Reynolds
12  and, when he began to lose the fight, which would have resulted in a loss of respect within his
13  gang culture, Cardenas pulled out his knife and stabbed Reynolds." *Id.* at *9. Moreover, the
14  appellate court concluded that the probative value of the gang related evidence was not
15  outweighed by its prejudice. *Id.* In addition, the appellate court found that petitioner's prior
16  statements were relevant to show that petitioner had the mentality of a gang member, as
17  described by the gang expert. *Id.* at *12. Thus, concluded the state appellate court, petitioner's
18  prior statements were relevant to demonstrate that the stabbing was likely motivated by gang
19  culture, and that petitioner did not "just stand by and do nothing" when Samantha was
20  "disrepected."

21         The admission of evidence is not subject to federal habeas review unless a specific
22  constitutional guarantee is violated or the error is of such magnitude that the result is a denial of
23  the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021,
24  1031 (9th Cir. 1999). The Supreme Court "has not yet made a clear ruling that admission of
25  irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant
26  issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that
27  trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under
28

1 Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established
2 Federal law under § 2254(d)). Because there is no "clearly established" federal law regarding
3 this issue, this federal claim must be denied.

4 In addition, the due process inquiry in federal habeas review is whether the admission of
5 evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v.*
6 *Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). Only if there are no permissible inferences that the
7 jury may draw from the evidence can its admission violate due process. *See Jammal v. Van de*
8 *Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

9 Here, as the state appellate court found, the gang-related evidence was relevant to
10 demonstrate petitioner's motive. The jury had already heard evidence that petitioner told the
11 others that petitioner was a Northerner, and the initial introductions between petitioner and the
12 others in the hotel room had gang overtones in that the other young men understood petitioner to
13 be a Norteno. The prosecution's theory of the case was that petitioner stabbed Reynolds because
14 Reynolds had just disrepected Samantha, with whom petitioner recently had sexual intercourse.
15 According to gang culture, by extension, Reynolds had disrespected petitioner as well. Thus,
16 gang-related evidence and testimony from the gang expert, as well as petitioner's prior
17 statements about gang members' mentality were relevant to demonstrate gang culture, gang
18 concepts of respect and disrespect, and how the slapping of Samantha would motivate petitioner
19 to stab Reynolds.

20 Finally, even assuming that it was error to admit gang-related evidence, petitioner has not
21 shown that error had "a substantial and injurious effect or influence in determining the jury's
22 verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). As the state appellate court noted,
23 "the evidence presented at trial did not support either a verdict of manslaughter or a viable claim
24 of self-defense. Manslaughter is not an available defense where the defendant engages in mutual
25 combat and then takes undue advantage of his victim by using a deadly weapon. The evidence
26 showed: (1) Cardenas armed himself with a knife before meeting two girls in Santa Cruz;
27 (2) Cardenas initiated the fistfight with Reynolds; and (3) Cardenas, at some point during the
28

1  fight, pulled out his knife and stabbed his unarmed opponent in the chest." *Cardenas*, 2012 WL

2  882887, at *12 (citation omitted).  Moreover, petitioner proffered no evidence suggesting that

3  the stabbing was in self-defense.  Thus, even without the gang-related evidence, based on the

4  evidence at trial, petitioner could not have been convicted of the lesser-included offenses, and

5  still would have been found guilty of second degree murder.

6      Accordingly, the state court's rejection of this claim was not contrary to, or an

7  unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2244(d).

8      2.   Jury instructions

9      Petitioner claims that the trial court erred when it refused to modify CALCRIM Nos. 371

10  and 372 to instruct the jury that "consciousness of guilt may not be considered in determining the

11  degree of defendant's guilt."  Petitioner asserts that the instructions as given permitted the jury to

12  impermissibly infer that petitioner was necessarily guilty because petitioner fled the scene and

13  tried to conceal evidence.

14      At trial, the jury was instructed with CALCRIM Nos. 371 and 372:

15         If the defendant tried to hide evidence, that conduct may show that he was
           aware of his guilt. If you conclude that defendant made such an attempt, it is up
16         to you to decide its meaning and importance. However, evidence of such an
           attempt cannot prove guilt by itself.
17
           If the defendant fled immediately after the crime was committed, that conduct
18         may show that he was aware of his guilt. If you conclude that the defendant
           fled, it is up to you to decide the meaning and importance of that conduct.
19         However, evidence that the defendant fled cannot prove guilt by itself.

20  (Resp. Ex. B, RT 3286.)

21      The California Court of Appeal rejected petitioner's claim, recognizing that the

22  instructions as given permitted, but did not mandate the jury to conclude that petitioner's

23  concealment of evidence and petitioner's immediate flight after the stabbing showed

24  consciousness of guilt. *Cardenas*, 2012 WL 882887, at *13.  The state appellate court relied on

25  state law and concluded, "[W]e have repeatedly rejected the argument that instructions on

26  consciousness of guilt, including instructions regarding the defendant's flight following the

27  crime, permit the jury to draw impermissible inferences about the defendant's mental state, or are

28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.13\Cardenas199hcden.wpd

13

1    otherwise inappropriate where mental state, not identity, is the principal disputed issue." *Id.*
2    (quoting *People v. Martinez*, 47 Cal. 4th 399, 450 (2009)).

3            A challenge to a jury instruction solely as an error under state law does not state a claim
4    cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71-72
5    (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show
6    that the ailing instruction by itself so infected the entire trial that the resulting conviction violates
7    due process. *Id.* at 72. Instructions that merely create a permissive inference, such as the ones at
8    issue here, do not shift the burden of proof, but they nonetheless violate due process unless it can
9    be said "'with substantial assurance'" that the inferred fact is "'more likely than not to flow from
10   the proved fact on which it is made to depend.'" *County Court of Ulster County v. Allen*, 442
11   U.S. 140, 167 & n.28 (1979) (quoting *Leary v. United States*, 395 U.S. 6, 36 (1969)).

12           Here, the instructions as given left both the existence and significance of the
13   circumstances to the jury. The wording of the instructions, combined with other instructions,
14   directed the jury to ignore instructions found inapplicable to the facts. Further, the jury was
15   instructed that, even if flight or concealment occurred, that evidence alone was not enough to
16   prove guilt. The instructions did not shift or reduce the burden of proof.

17           Thus, the California Court of Appeal's rejection of the claim was not contrary to, or an
18   unreasonable application of, clearly established federal law.

19           3.      Cumulative prejudice

20           Petitioner's last claim is that he is entitled to habeas relief based on the cumulative effect
21   of the alleged state court errors. In some cases, although no single trial error is sufficiently
22   prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a
23   defendant so much that his conviction must be overturned. *See, e.g., Alcala v. Woodford*, 334
24   F.3d 862, 893-895 (9th Cir. 2003) (reversing conviction where multiple constitutional errors
25   hindered defendant's efforts to challenge every important element of proof offered by
26   prosecution). However, where no single constitutional error exists, nothing can accumulate to
27   the level of a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir.

28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.13\Cardenas199hcden.wpd

14

1  2002).

2  **CONCLUSION**

3       Petitioner's petition for writ of habeas corpus is DENIED.

4       The federal rules governing habeas cases brought by state prisoners require a district

5  court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its

6  ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. Petitioner has

7  not shown "that jurists of reason would find it debatable whether the petition states a valid claim

8  of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

9  Accordingly, a COA is DENIED.

10      The Clerk shall close the file.

11      IT IS SO ORDERED.

12  DATED:  12/4/14

                         LUCY H. KOH

13                           United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.13\Cardenas199hcden.wpd